IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In re | In Chapter 11 Proceedings |
|---|---|
| Kimberly Ann Kent & Gregg Terry Kent, | Case No. 07-bk-03238-SSC |
| | **MEMORANDUM DECISION** |
| Debtors. | **RE: ANNUITIES** |

## I.  PRELIMINARY STATEMENT

This matter comes before the Court pursuant to a "Motion For Order Determining That Annuities Are Not An Asset of the Estate" ("Annuities Motion") filed with the Court by Kimberly Ann Kent & Gregg Terry Kent, the Debtors herein, on December 12, 2007.  The Debtors assert in their Annuities Motion that two annuities; one from American General Annuity Service Corporation ("AGASC Annuity"), and the other from MetLife Tower Resources Group, Inc. ("MetLife Annuity") (collectively the "Annuities"), are not assets of the estate pursuant to Bankruptcy Code §541(c)(2), because the Annuities constitute valid spendthrift trusts under Arizona law.[1]  *See* A.R.S. §14-7701.  In response, Kent & Wittekind, P.C. and Osborn Maledon, P.A., filed their Objections on January 8, 2008, claiming that the Annuities were indeed property of the bankruptcy estate.  At the initial hearing on January 15, 2008, the Court instructed the parties to file their Stipulated Facts.  On January 29, 2008, this Court rendered its decision on the record, advising the parties that a formal written decision would be forthcoming.

---

**1**  The Court previously ruled at a hearing on October 4, 2007, that the Annuities were not exempt assets pursuant to Arizona law.  A.R.S. § 33-1126.  The Court refers the parties to that prior decision on the exemption issue.  It is not discussed herein.  See Docket Entry Nos. 80 and 85.  Kent & Wittekind, P.C.'s objection to the Debtors' claim of exemption was sustained.

After conducting the hearing in the matter on January 29, 2008, taking into consideration the arguments of each of the parties, the documents filed, and the entire record before the Court, this Decision shall constitute the Court's finding of fact and conclusions of law pursuant to Fed.R.Bank.P. 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334 and 157. (West 2007).

## II. FACTUAL DISCUSSION

The Debtors filed their Chapter 11 bankruptcy petition on July 10, 2007.[2] On August 15, 2007, the Debtors filed their Schedules and Statement of Financial Affairs.[3]

On December 12, 2007, the Debtors filed their "Motion for Order Determining That Annuities Are Not An Asset Of The Estate." In the motion, the Debtors specifically argued that the Annuities were not assets of the estate and were exempt pursuant to Bankruptcy Code §541(c)(2), because the Annuities constituted valid spendthrift trusts under A.R.S. §14-7701.[4] After the hearing, on January 15, 2008, the parties submitted the following Stipulated Facts:[5]

1. Kimberly Kent, an attorney, represented a minor and her parents, with respect to personal injury claims. At the time Kimberly Kent negotiated the separate settlement agreements for the clients, the clients had fee agreements with Kent & Associates P.L.L.C. The settlements resulted in the purchase of the two Annuities that are the subject of this dispute.

2. One settlement was entered into on or about June 8, 2004. As a result of that settlement, a "Single Premium Immediate Annuity Policy" was purchased by the settling

---

**2**. See Docket Entry No. 1.

**3**. See Docket Entry No. 32.

**4** The Debtors also mistakenly used the expression that the Annuities were "exempt." As noted, the Court previously ruled on the issue, and if the assets are not part of the estate, there is no need to consider whether the assets are exempt. The Debtors may use properly excluded assets as they wish.

**5** See Docket Entry No. 151.

2

1  defendant from American General Life Insurance Company.  Exhibit A is an American

2  General Life Insurance Company Single Premium Immediate Annuity Contract (the "AGASC

3  Annuity").

4         3.  The owner of the AGASC Annuity is American General Annuity Service

5  Corporation.  Kimberly Kent is the measuring life for the AGASC Annuity.  As the

6  measuring life, and with no other designated payee, Kimberly Kent is the payee under the

7  AGASC Annuity.  The beneficiary of the AGASC Annuity is the "Estate of Kimberly Kent."

8  The beneficiary is entitled to payments under the AGASC Annuity, in the event the payee

9  dies prior to the completion of the payments.

10        4.  The AGASC Annuity provides for a payment in the amount of $25,000.00

11  every other year, commencing on May 1, 2009, and ending on May 1, 2017.  The AGASC

12  Annuity further provides for a payment of $31,585.54 on May 1, 2019.

13        5.  The AGASC Annuity states that it is a "legal contract between the Owner

14  and American General Life Insurance Company."  Payment under the AGASC Annuity is

15  guaranteed by AGC Life Insurance Company.  The AGASC Annuity provides that:

16  "No Payee or Beneficiary of this policy has the power to assign any payments or benefits of

17  this annuity policy.  Any attempt to make an assignment is void."

18        6.  The payee is the person who receives the income payments.  The Annuity

19  provides that to the maximum extent permitted by law, payments will not be subject to: (1)

20  transfer (any attempt to make such transfer is void); (2) assignment (any attempt to make such

21  assignment is void); (3) alteration (except for misstatement of age or sex); (4) claims by

22  creditors before any payment is due; (5) encumbrance by creditors or beneficiaries; (6)

23  judicial or legal process by creditors.

24        7.  Another settlement was reached in 2006.  As a result of this settlement, an

25  annuity was purchased by the settling defendant from Metropolitan Life Insurance Company

26  (the "MetLife Annuity").  Exhibit B is the MetLife Annuity.

27

28

1    8. The MetLife Annuity provides that payments are payable to Kimberly

2  Kent, commencing on February 1, 2016, at the rate of $5,107.00 per month, for ten (10) years

3  only. The beneficiary is the "Estate of Kimberly Kent."

4    9. On the MetLife Annuity, the beneficiary receives payments only in the

5  event of the death of the "measuring life." The measuring life is Kimberly Kent. MetLife

6  Tower Resources Group, Inc. is the owner of the MetLife Annuity. The MetLife Annuity

7  Contract provides that the payments are non-assignable, and are exempt from the claims of

8  creditors to the maximum extent permitted by law.

9    10. The AGASC and the MetLife Annuity provide for certain payments to be

10  made by the respective Annuity owner to Kimberly Kent, or, if she is deceased, to her Estate

11  or designated beneficiary, if any.

12    11. Each Annuity contains provisions that the payments due thereunder are

13  not assignable and shall not be subject to transfer, assignment, alteration, or the claims,

14  encumbrances, or judicial process of creditors.

15    12. Neither Annuity makes mention of a trust, a settler, a trustee, or a trust

16  beneficiary.

17    Additional unnumbered Stipulated Fact:

18    According to the AGC Life Insurance Corporate Guarantee, AGC Life

19  Insurance states that:

20    [AGASC, a] Texas corporation, is empowered to act as
     assignee with respect to qualified assignments of structured
21    settlements, as provided in Section 130(c) of the Internal
     Revenue Code of 1986, as amended . . .
22
     AGASC has entered into the above-referenced Qualified
23    Assignment for the Claimant.

24  The AGC Life Insurance Corporate Guarantee lists the Debtor as the Claimant. No similar

25  language is set forth in the MetLife Annuity.

26

27

28

4

### III.  ISSUES

A.  Whether the Annuities are Trusts under Arizona Law and, Hence, may be Excluded from the Estate.

B.  Whether *Patterson v. Shumate* and its Progeny Have Created a New Exclusion From the Estate.

### IV.  LEGAL ANALYSIS

Upon the filing of a bankruptcy petition, an estate is created consisting of all of the legal and equitable interests of the debtor in property.  11 U.S.C. § 541(a)(1) (West 2007).  This is true notwithstanding "any provision in the agreement, transfer instrument, or applicable non-bankruptcy law that restricts or conditions transfer" of an interest of the debtor in property by the debtor except that "a restriction on a transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable under title 11."  11 U.S.C. §§ 541(c)(1)(A) and (c)(2) (West 2007).  In other words, § 541(c)(1) brings all of the debtor's property into the estate in a one-time transfer without regard to restrictions or conditions on the transfer, unless the property is within the parameters of § 541(c)(2).

Since Arizona is an opt-out jurisdiction under A.R.S. § 33-1133,[6] it is clear that the Debtors are not entitled to the federal exemptions provided in 11 U.S.C. § 522(d).[7] A.R.S. § 33-1126 (West 2007), which deals with the exemption of annuity contracts under

---

[6]  A.R.S. § 33-1133(B) states, in pertinent part, that "[i]n accordance with 11 U.S.C. 522(b), residents of this state are not entitled to the federal exemptions provided in 11 U.S.C. (d)."

[7]  11 U.S.C. § 522(d) sets forth property and amounts that may be exempted under §522(b)(2).  Subsection (b)(2) provides that exempt property "listed in this paragraph is property that is specified under subsection (d), unless the State law that is applicable to the debtor under paragraph (3)(A) specifically does not so authorize."  As a result, the Debtors are unable to avail themselves of Section 522 (d)(10), which provides an exemption for a "payment under  . . . annuity . . on account of illness, disability, death, age, or length of service of the debtor. . ."

5

Arizona law, has previously been determined by this Court as not applicable to the subject

Annuities. Hence, the Debtors' current Motion to exclude the Annuities from the estate.

A. Whether the Annuities are Trusts under Arizona Law and, Hence, may be Excluded from the Estate.

The Debtors assert that the Annuities fall under the exception of § 541(c)(2). According to the documents, the Debtors are not the owners of the Annuities and the beneficial interests of the Debtors are non-assignable. Given this information, the Debtors argue that the Annuities constitute valid spendthrift trusts under A.R.S. § 14-7701, because the documents provide that the beneficial interest is non-assignable and because the Debtor, Kimberly Kent is, as a matter of law, not the settlor of either spendthrift trust pursuant to A.R.S. §1 4-7705(D).

The Bankruptcy Code does not define what constitutes a trust for purposes of 11 U.S.C. §§ 541(c)(2). Although an interpretation of this Subsection is dependent upon a review of federal law, Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242 (1992), the Court must analyze applicable state law, Butner v. U.S., 440 U.S. 48, 55, 99 S.Ct. 914, 918 (1979), to determine the meaning of the term "trust," since the Debtors argue that their Annuities are excluded from the estate as a result of the Arizona spendthrift trust statutes. The Debtors' citations to Arizona statutory provisions concentrate on the operation and access of creditors to spendthrift trusts, but do not consider the formation, existence, or nature of a trust.

In defining what a trust is under Arizona law, the Courts refer to the Restatement of Trusts for guidance. See In the Matter of the Naarden Trust, 195 Ariz. 526, 900 P.2d 1085 (Ct. App. Ariz. 2000); and Brooks v. Valley National Bank, 113 Ariz. 169, 173, 548 P.2d 1166, 1170 (Sup. Ct. Ariz. 1976). Therefore, this Court will rely on the Restatement (Third) of Trusts to determine if the Debtors' Annuities are indeed trusts.

Pursuant to the Restatement (Third) of Trusts §2 (2003), "a trust is a fiduciary relationship with respect to property, arising from a manifestation of intention to

6

create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee." The Courts interpreting Arizona law have been clear that the essential elements of a valid trust include a competent settlor, a trustee, a clear and unequivocal intent to create a trust, an ascertainable trust <u>res</u>, and sufficiently certain beneficiaries. <u>See</u> <u>Doss v. Kalas</u>, 94 Ariz. 247, 252, 382 P.2d 169, 174 (Sup. Ct. Ariz. 1963), <u>citing</u> <u>Carrillo v. Taylor</u>, 81 Ariz. 14, 299 P.2d 188 (1956).

In this particular case, the Debtors are not the owners of the Annuities, and the Debtors concede that they are not the settlors. According to the Annuity documents, the owners are American General Annuity Service Corporation and MetLife Tower Resources Group, Inc. The beneficiary is stated as the "Estate of Kimberly Kent," not the Debtors. Kimberly Kent, however, is the measuring life. While the documents state that the Debtor, Kimberly Kent, is the payee, the documents do not incorporate any language indicating who is the settlor or trustee. The documents do not have any provisions concerning the duties or responsibilities of the trustee. Neither Annuity has a provision stating that it constitutes the <u>res</u> of a trust. The documents do not state that the funds that were utilized to set up the Annuities were transferred to American General Annuity Service Corporation or MetLife Tower Resources in trust for either of the Debtors. The Debtors have shown no clear and unequivocal intent in the documents to create a trust. Given the information provided in the Annuity documents and the parties' Stipulated Facts, this Court concludes that the essential elements to create a trust have not been shown under Arizona case law or the <u>Restatement (Third) of Trusts</u>.[8]

---

**8** Ms. Kent is an experienced litigator in Arizona, and this Court has already explored, at other hearings, the numerous retirement planning devices established by the Debtors and the creation of accounts to set aside funds for the education of the Debtors' children. The Debtors have exhibited a sophistication in creating and maintaining estate planning and other devices to save appropriately for themselves and their children. For instance, the Court has already ruled that the Debtors may continue to make payments to the retirement plans that each maintains at their place of employment. It is also true that Kent & Associates PLLC, the

1    Without addressing the fundamental issue of whether they have created a

2    trust under Arizona law, the Debtors place great reliance on A.R.S § 14-7701 et seq. (West

3    2007),  for their argument that the Annuities nevertheless constitute a spendthrift trust.

4    Because Kimberly Kent is, as a matter of law, not the "settlor" of the Annuities, and the

5    Annuities contain anti-alienation provisions, the Debtors believe they are within the

6    parameters of the Arizona spendthrift trust provisions.  First, to be within said provisions, the

7    Debtors must have created a trust; that has not happened.  Second, in reviewing the provisions

8    cited by the Debtors, the Court concludes that the Debtors' reliance is misplaced.

9    Section 14-7701(A) (West 2007) states:

10   Except as provided in this article, if a trust instrument
     provides that a beneficiary's interest in income is not subject
11   to voluntary or involuntary transfer, the beneficiary's interest
     in income under the trust shall not be transferred and is not
12   subject to enforcement of a money judgment until paid to the
     beneficiary.
13

14   This Subsection outlines the limited access of creditors to a spendthrift trust, if certain

15   provisions are placed in the trust documents.  However, it assumes that there is a trust

16   instrument and a beneficiary's interest to be protected.  In this case, there is an Annuity and

17   Ms. Kent is a payee.  This Subsection does not refer to the creation of a trust, and the Debtors

18   may not use the language therein to somehow create one for themselves.

19   A.R.S.  § 14-7705, which also addresses "settlors as beneficiaries," is of no

20   assistance.  First, the Debtors have conceded that they are not the settlors of the Annuities.

21   Moreover, in reviewing the Section, Subsection D states as follows:

22   For purposes of this section, amounts contributed to a trust
     by any corporation, professional corporation, partnership,
23   governmental entity trust, foundation or other entity are not
     deemed to have been contributed by its directors, officers,
24

25   ───────────────

26   same entity that apparently was involved with the creation of these Annuities, assisted the
     Debtors in setting up the Section 529 Accounts  for the education of the Debtors' children.
27   Thus, the Court is reluctant to go beyond the four corners of these Annuity contracts and
     somehow create one or more trusts when the Debtors have manifested no clear and
28   unequivocal intent to create a trust.

8

shareholders, partners, employees, beneficiaries or agents.
Powers, duties or responsibilities granted to or reserved by
the settlor pursuant to the trust and any actions or omissions
taken pursuant to the trust are deemed to be the powers,
responsibilities, duties, actions or omissions of the settlor
and not those of its directors, officers, shareholders, partners,
employees, beneficiaries or agents. [emphasis added].

It is clear that for purposes of A.R.S. § 14-7705(D)(West 2007), a settlor may be a professional corporation, such as a law firm, and any contributions to a spendthrift trust by such an entity is not considered to be a contribution of the law firm partner. However, if the Debtors are arguing that Ms. Kent's law firm is somehow the "settlor" of the Annuities, there must be some type of acknowledgment in the documents as to who the settlor is and what "powers, duties or responsibilities," if any, are reserved by it. As stated in the parties' Stipulated Facts, neither Annuity makes mention of a settlor or even a trustee or trust beneficiary. Therefore, although the Debtors assert that Ms. Kent is not the settlor for purposes of meeting the requirements under A.R.S. §14-7705(D), they have failed to show that there is such a party.

More fundamentally, the Debtors have failed to show that they have a spendthrift trust under A.R.S. § 14-7701, et seq. (West 2007). There is no trust instrument. There is no trustee. There is individual or entity that has agreed to take on the task of trust administration, using the appropriate fiduciary standard to act in the interests of the trust beneficiary. There is no settlor. There is no transfer of funds into the Annuities as a res for a trust. Moreover, the Debtor, Kimberly Kent, is simply a payee under the relevant documents. Such a term does not create the concomitant duty of any individual or entity acting on behalf of the Annuity to provide the normal fiduciary relationship of a trustee to a beneficiary.[9]

---

**9** Of further concern is that although there is a beneficiary, the estate of Kimberly Kent, that beneficiary has no access to the funds so long as the payee is alive.

9

B.  Whether *Patterson v. Shumate* and its Progeny Have Created a New Exclusion From the Estate.

The Debtors also place a great deal of reliance on the decision of Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242 (1992), and its progeny, in support of their argument that a broad interpretation should be placed on the term "trust," as utilized in Section 541(c)(2).   In the Patterson decision, the United States Supreme Court considered whether the debtor's interest in an employer's pension plan that was set up as a trust and contained the requisite anti-alienation provision to be a tax-qualified plan under the Employee Retirement Income Security Act of 1974 (ERISA), could be excluded as an asset of the bankruptcy estate. If the debtor held a beneficial interest in a trust that had an anti-alienation provision which was enforceable under "applicable non-bankruptcy law," the beneficial interest could be excluded.  The Supreme Court held that the aforesaid phrase was not just limited to state law, but encompassed any relevant non-bankruptcy law, including federal law such as ERISA. Patterson at 759.  However, the Supreme Court reached its decision in the context of a pension plan that was set up as a trust.  A trustee was appointed under the plan and administered the plan for the benefit of the employees.  The plan also contained an anti-alienation provision and the other indicia of a spendthrift trust.[10]  According to the Supreme Court, this anti-alienation provision constituted an enforceable transfer restriction for purposes of §541(c)(2), given that under ERISA, the plan trustees or fiduciaries were required

---

**10**.  The decision states:
> Section 206(d)(1) of ERISA, which states that '[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated,' 29 U.S.C. §1056(d)(1), clearly imposes a 'restriction on the transfer' of the debtor's 'beneficial interest' in the trust.  The coordinate section of the Internal Revenue Code, 26 U.S.C. §401(a)(13), states as a general rule that "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated,' and thus contains similar restrictions.

Patterson, at 759.

1    to discharge their duties "in accordance with the documents and instruments governing the

2    plan." Patterson, at 760 (citing 29 U.S.C. §1104(a)(1)(D)).

3                    Given the characteristics of the ERISA-qualified plan in Patterson, the

4    Supreme Court held that the debtor's interest in the plan might be excluded from the property

5    of the bankruptcy estate.  Patterson, at 765.  It recognized that it vigorously had enforced

6    ERISA's prohibition on the assignment or alienation of pension benefits, and declined to

7    recognize any exceptions to ERISA's anti-alienation provision.  Id. at 760 (citing Guidry v.

8    Sheet Metal Workers Nat. Pension Fund, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782

9    (1990)).  The Supreme Court's decision to exempt the ERISA-qualified pension plan trust

10   from the bankruptcy estate was, in essence, giving appropriate effect to ERISA's goal of

11   protecting pension benefits.  Id. at 765.

12                   The Debtors rely on the Patterson case, asserting that the exclusion from the

13   property of the estate in §541(c)(2) for a "trust" and a "restriction" on the transfer of a debtor's

14   interest therein should be interpreted broadly to include any plan and any broad

15   anti-alienation language contained in the documents.  As a result, the Debtors state that a

16   "trust" for purposes of §541(c)(2), may be more than a traditional trust created by trust

17   documents under applicable law and should encompass the Annuities herein as well.  More

18   particularly, the Debtors focus on Page 758 of the Patterson case, which states, "The natural

19   reading of the provision [§541(c)(2)] entitles a debtor to exclude from property of the estate

20   any interest in a *plan or trust* that contains a transfer restriction enforceable under any

21   relevant nonbankruptcy law." [emphasis added].  Patterson, at 758.

22                   Of critical concern to this Court is the disparity between the facts of the

23   Patterson decision and those set forth in this case.  First, the statement that the Debtors rely on

24   is dicta.  It was not critical to the decision of the Court.  As noted, the Supreme Court, in

25   Patterson, dealt with a specific pension plan that was set up as a trust, that had a trustee acting

26   as a fiduciary on behalf of the employees, as the beneficiaries under the plan, and that trust

27   also  included the anti-alienation provisions required under ERISA.  The sole focus of the

28

Court was to interpret the phrase "under applicable non-bankruptcy law," and whether that phrase also encompassed federal law. Clearly the Debtors must have entered into something more than a contract with an anti-alienation provision in it, since Section 541(c)(1)(A) states that agreements which generally restrict a transfer by a debtor under applicable law are still property of the estate. But the Debtors have not shown anything more. The Annuities are contracts which contain anti-alienation provisions.

There is also a policy reason for excluding such contracts as the Annuities from the parameters of Section 541(c)(2). A debtor could draft or enter into an agreement that provided an ongoing payment stream to the debtor, outside of the reach of creditors because of a restriction on the transfer of the interest, yet the agreement would not have the necessary third party acting independently as a fiduciary/trustee for the benefit of the debtor as a beneficiary. As noted, there is a specific exemption, under Arizona law, for annuity contracts. It is impossible for this Court to ignore that specific exemption and state that although the Debtors failed under Arizona law to qualify for the exemption, they are nevertheless able to have the same contract qualify as a "trust" under federal law and Section 541(c)(2). If the Court agrees with the Debtors' argument, then what is the purpose of the statutory language in Section 541(c)(2) which excludes contracts that contain such restrictions on transfers and allows the contracts, or the property to which they refer, to be included as property of the estate? The Debtors' analysis allows the limited exception of Section 541(c)(2) concerning a trust to be expanded to include any type of contract with the requisite anti-alienation language. This Court cannot accept the Debtors' broad interpretation of the trust language contained in Section 541(c)(2).

The Debtors also argue that Kent & Associates P.L.L.C. caused the Annuities in question to be purchased as a part of a retirement benefit for the Debtors.[11] See "Debtor's Additional Brief Regarding Motion For Order That the Annuities Are Not An Asset Of The

---

**11** The Court has already discussed, at length, why the Annuities are not trusts under Arizona law.

Estate," filed on January 25, 2008, page 4. However, nowhere in the parties' Stipulated Facts is it indicated that the Annuities were purchased as a part of a retirement benefit for the Debtors. Rather, the facts state that the Annuities resulted from settlement agreements entered into by the clients of Kent & Associates. The Annuities allowed for the payment of attorneys' fees and costs arising from the settlements to be paid over a period of time. However, as noted, the Debtors already have retirement plans in place as their respective employments, and these Annuities have not been established as the type of trust with the protections in place to create a type of pension plan where the goal is to protect pension benefits. Therefore, this Court is not dealing with the type of policy issues that were inherent in the Patterson decision.

The Debtors also rely on the decision of In re Laher, 496 F.3d 279 (3rd Cir. 2007), which held that a tax-deferred annuity retirement plan, with a restriction on transfers, was a spendthrift trust under New York law. The Laher Court held that the Patterson case should be read broadly, concluding that "Patterson does not opine as to the meaning of 'trust,' but it does employ language that could be interpreted to mean that §541(c)(2) is not limited to literal trusts or trusts formed explicitly." Id. The Laher Court focused on the nature of the fund, not the label, and rejected the argument that an annuity could not be a trust. The Debtors, therefore, rely on the Laher decision to support their position that the Annuities, with a restriction on transfers, could be considered spendthrift trusts.

However, there are factual dissimilarities between Laher and this case. First, in Laher, the Court addressed a certain tax-deferred annuity retirement plan, in which pre-tax contributions were taken from the debtor's paycheck and accumulated into a sum that would be used to purchase a contract that would pay the debtor an annuity, over time, after retirement. Id. at 280. The debtor's salary contributions and the employer's contributions were fixed as percentages of the employee's salary. Id. Under the plan, 3% of an employee's compensation was withheld from the debtor's paychecks, and the employer contributed an amount equal to 7% of the employee's compensation. Id. Participation in the plan was

13

mandatory. Id. In addition, the manager of this plan was the Teacher Insurance and Annuity Association-College Retirement Equities Fund (TIAA-CREF). Id. at 281. Moreover, the plan included a "Retirement Transition Benefit," whereby, at retirement, a participant "[might] elect to receive up to 10% of his or her Accumulated Accounts in TIAA or CREF in a lump sum" prior to their conversion to retirement income. See footnote 3 at 281. A plan member could only begin to receive plan benefits after retirement or employment termination. Id. at 281. There was also no dispute that the annuities, in the Laher case, qualified under §403(b) of the Internal Revenue Code.[12] See id., footnote 2.

Carefully reading the facts of the case, this Court concludes that it not dealing with the same type of pension plan structure as in Laher. The Court, in Laher, described the factors necessary for what it thought was an ERISA-qualified annuity plan, based on specific provisions and characteristics of the annuities. However, those same provisions and characteristics are not in place in this case. We are not dealing with the specific structure created to provide retirement benefits. We are not dealing with a plan that is mandatory for the Debtors, or that requires salary or employer contributions. We are not dealing with an annuity that is qualified under §403(b) of the Internal Revenue Code, and, thus, exempt under 11 U.S.C. §541(b)(7).[13] There is no long-term manager of the funds to provide investment decisions for a group of individuals as they approach retirement. The

---

**12** Section 403(b) of the Internal Revenue Code specifically addresses the taxability of a beneficiary under an annuity purchased by section 501(c)(3) organizations (non-profit organizations) or public schools.

**13**. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 did not amend §541(c)(2), but did add Section 541(b)(7), which created protection for annuities. That provision states that the property of the estate does not include "any amount . . . withheld by an employer from the wages of employees for payment as contributions . . . to . . .a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986," as well as "any amount . . . received by an employer from employees for payment as contributions . . . to . . . a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986." §541(b)(7)(A)-(B). This Court has already determined, in yet another decision, that the Debtors do have appropriate retirement plans through their respective firms or employers, into which they have been making contributions and which are not property of the estate under Section 541(b)(7).

14

Stipulated Facts provided by the parties and the underlying Annuities have no managers or participants; only a payee. Therefore, the controls set up in the <u>Laher</u> case simply do not exist in the case at hand.

The <u>Laher</u> court also relied on New York law to determine whether the tax-deferred annuity retirement plan constituted a trust. The <u>Laher</u> court concluded that all four elements had been shown under applicable state law, finding that the debtors had proven "(1) a designated beneficiary, (2) a designated trustee, who is not the same person as the beneficiary, (3) a clearly identifiable res, and (4) the delivery of the res by the settlor to the trustee with the intent of vesting title in the trustee." <u>In re Laher</u>, 496 at 288 (<u>citing Agudas Chasidei Chabad of U.S. v. Gourary</u>, 833 F.2d 431, 433-34 (2d Cir. 1987). However, as has been discussed, Arizona law requires that different elements be shown to create a trust. The Debtors have not show those requisite elements.

The Annuities are similar to the structured settlements established in the decision of <u>In re Sparks</u>, 2005 WL 1669609 (Bkrtcy. W.D. Tenn. 2005). The Court, in <u>Sparks</u>, evaluated a settlement agreement executed between the debtor and an unnamed party that provided for the payment to the debtor of certain periodic payments as damages on account of personal injury or sickness. <u>Id.</u> By virtue of a Qualified Assignment, the obligation to make the settlement payments to the debtor was assigned to and assumed by American General Assignment Company ("AGAC"). <u>Id.</u> AGAC purchased an annuity contract from American General Annuity Insurance Company ("AGAIC") to fund this liability. <u>Id.</u> Pursuant to the Qualified Assignment, the debtor was entitled to receive a series of payments commencing on February 1, 2008, in the amount of $1,310.71 per months for ten years. <u>Id.</u> The Qualified Assignment also had an anti-alienation provision. <u>Id.</u> at 2. The <u>Sparks</u> Court determined that the debtor's interest in the Qualified Assignment was a contractual right, because the interest that the debtor held immediately preceding the filing of her bankruptcy case was her contractual right to receive payments from AGAC under the Qualified Assignment. <u>Id.</u> at 3. Immediately preceding the filing of her bankruptcy case, the

debtor held no rights under the annuity contract, because the annuity contract was purchased for the use and convenience of AGAC in discharging its obligation to the debtor under the Qualified Assignment.  Id.

Similar to Sparks, in this case, a "Single Premium Immediate Annuity Policy" was purchased from AGC Life as a result of a settlement.  According to the AGASC Annuity document, AGC Life represented that AGASC is "empowered to act as assignee with respect to qualified assignment of structured settlement, as provided in Section 130(c) of the Internal Revenue Code of 1986, as amended, and that "AGASC has entered into the above reference [sic] Qualified Assignment for the Claimant."  Not only is the Claimant stated as the Debtor, Ms. Kimberly Kent, but the actual AGASC Annuity document is clearly similar to the Qualified Assignment in the Sparks case.  Therefore, it appears the AGASC Annuity, and its assignment, are consonant with the contracts which were reviewed in the Sparks case.  Looking at the substance of the transaction, what this Court is analyzing is a contract which is similar to a structured settlement, not a spendthrift trust.

The Sparks Court also stated that even if it were to conclude that the presence of a trust is not strictly required for application of §541(c)(2), AGAC and AGAIC pointed to no applicable state or federal law that prohibited the transfer of the debtor's interest in the Qualified Assignment.  Id. at 4.  Nothing in federal law prohibits the transfer of the debtor's right to receive payments pursuant to a structured settlement agreement.  Id.  In fact, the Court in Sparks stated that in order to encourage the use of structured settlements in personal injury cases, Congress provided favorable tax treatment for certain transactions involving such agreements.  Id., citing 26 U.S.C. §§ 104(a)(2) , 130(a).  Moreover, pursuant to the Tennessee Structured Settlement Act, TENN.CODE ANN. §47-18-2601-2607, even if anti-alienation language were contained in the settlement, the debtor was not prohibited from voluntarily transferring the rights under a structured settlement agreement.  Id. at 3.  The state law provided specific procedures and guidelines for the approval of such transfers.  Id.  The Act required disclosure to the payee and prior court approval of the transfer.  Ultimately, the

1    <u>Sparks</u> Court concluded that given the specific provisions under applicable state law that

2    allowed for the transfer of the debtor's interests under a structured settlement agreement, the

3    debtor's right to payment became property of the estate by virtue of §541(c)(1)(A)

4    notwithstanding the language in the Qualified Assignment prohibiting transfer. <u>Id</u>. at 4.

5             Arizona law also provides for a process to transfer the rights of a debtor in a

6    structured settlement. <u>See</u> A.R.S. §§ 12-2902 and 2903 (West 2007). Thus, there is no policy

7    prohibiting the Debtors, in this case, from structuring their right to receive payments, over a

8    period of time, from a third party. Because Ms. Kent's clients had entered into settlements of

9    their personal injury claims similar to the structured settlements reviewed in the <u>Sparks</u> case,

10    it is not surprising that Ms. Kent's receipt of her attorneys' fees, for services rendered to her

11    clients, would assume a similar payment scheme as a structured settlement. With no specific

12    prohibition or absolute restriction on the transfer of the Debtors' interests under a structured

13    settlement agreement in either federal or state law, the Debtors' right to payment under the

14    Annuities became property of the estate by virtue of §541(c)(1)(A), notwithstanding the anti-

15    alienation clauses in the Annuities.

16

17                    **IV. CONCLUSION**

18             Based upon the foregoing, the Court finds that the Debtors' Annuities are

19    indeed property of the bankruptcy estate, and are not excluded from the estate pursuant to 11

20    U.S.C. § 541(c)(2). The Court will execute a separate Order incorporating this Decision and

21    denying the Debtors' Motion for Order Determining That Annuities Are Not An Asset of the

22    Estate.

23

24    **DATED this 31st day of March, 2008.**

25                      _Sarah Sharer Curley_

26                      **Honorable Sarah Sharer Curley**
                            **United States Bankruptcy Judge**

27

   BNC to Notice.

28

**EXHIBIT A**

# AMERICAN GENERAL LIFE INSURANCE COMPANY

## SINGLE PREMIUM IMMEDIATE ANNUITY POLICY

AMERICAN GENERAL LIFE INSURANCE COMPANY (the "Company"), a stock company, will pay income payments as described in the Payment Schedule on page 3 of this annuity policy. The dates of the first income payment, the amount of each payment, and any guarantees of amounts to be paid are also shown on the Payment Schedule.

All payments and benefits will be payable subject to the terms of this annuity. The consideration for this annuity policy is the application and the payment in advance of a single premium payment. Such single premium payment must be paid on or before delivery of the annuity policy.

**Read this policy carefully. This annuity policy explains how the annuity works, and is a legal policy between the owner and American General Life Insurance Company.**

**RIGHT TO CANCEL:** If, after reading this policy the owner is not satisfied for any reason, return the policy to us or any agent authorized by us within ten days after receiving it (or a longer period if required by the state). If mailed in the United States in a properly addressed envelope with first class postage, it will deem to be received by the Company on the date of the postmark, registration or certification. We will refund any premiums paid, less any prior payments made by us, and the policy will then be void.

This is a SINGLE PREMIUM IMMEDIATE ANNUITY. Income payments are payable as stated in the Payment Schedule until all payments guaranteed under this policy have been paid. Guarantees under this policy are shown in the Payment Schedule.

SIGNED AT THE HOME OFFICE ON THE DATE OF ISSUE.

SECRETARY

PRESIDENT

**THIS POLICY IS NON-PARTICIPATING –
DIVIDENDS ARE NOT PAYABLE.
PLEASE READ THIS POLICY CAREFULLY.
THE POLICY IS IRREVOCABLE AND HAS NO CASH VALUE OR
SURRENDER VALUE AND CANNOT BE COMMUTED OR SURRENDERED.**

**THIS POLICY IS A LEGAL CONTRACT BETWEEN THE OWNER AND
AMERICAN GENERAL LIFE INSURANCE COMPANY.**

Home Office: Houston, Texas

Administrative Office: 205 East 10th Avenue, Amarillo, TX 79101

01015

# INDEX

|  | Page |
|---|---|
| PAYMENT SCHEDULE | 3 |
| POLICY | 4 |
| POLICY DATE | 4 |
| ANNUITY DATE | 4 |
| MISSTATEMENT OF AGE OR SEX | 4 |
| INCONTESTABILITY | 4 |
| MEASURING LIFE | 4 |
| PAYEE | 4 |
| INCOME PAYMENTS | 4 |
| PROOF OF SURVIVAL | 4 |
| DEATH OF THE MEASURING LIFE | 4 |
| DEATH OF JOINT MEASURING LIFE | 5 |
| OWNER | 5 |
| BENEFICIARY | 5 |
| CHANGE OF OWNER AND BENEFICIARY | 5 |
| COMMON DISASTER | 5 |
| ASSIGNMENT | 5 |
| ANNUITY APPLICATION | Attached |

01015

SCHEDULE

POLICY NUMBER: 415710

POLICY DATE: 6-08-2004

SINGLE PREMIUM: $10.00 AND OTHER VALUABLE CONSIDERATION

OWNER: AMERICAN GENERAL ANNUITY SERVICE CORPORATION

MEASURING LIFE: KIMBERLY ANN KENT

AGE (NEAREST BIRTHDAY) OF MEASURING LIFE ON EFFECTIVE DATE: 43

NUMBER, MANNER, AND MODE OF INSTALLMENT PAYMENTS TO BE MADE:

GUARANTEED PAYMENTS:

| BEGINNING DATE | ENDING DATE | PAYMENT AMOUNT | FREQUENCY OF PAYMENT | ANNUAL RATE OF IN-CREASE IN PAYMENTS |
|---|---|---|---|---|
| 5-01-2009 | 5-01-2017 | $25,000.00 | EVERY 2 YEARS | ---0--- |
| 5-01-2019 | 5-01-2019 | $31,585.54 | SINGLE | ---0--- |

IF THE MEASURING LIFE DIES PRIOR TO PAYMENT OF ALL INSTALLMENTS DURING THE GUARANTEED PERIOD, ANY REMAINING PAYMENTS DUE SHALL BE PAID IN ACCORDANCE WITH THE SETTLEMENT AGREEMENT, AS THEY BECOME DUE.

FIRST INSTALLMENT DUE DATE: 5-01-2009

PAGE 3

## GENERAL PROVISIONS

**Company Reference.** "We," "Our," "Us," or "Company," means American General Life Insurance Company.

**The Policy.** The annuity policy, the attached application, and any riders or endorsements constitute the entire policy. All statements made in the application are, in the absence of fraud, representations and not warranties.

Only an officer of American General Life Insurance Company may modify any annuity policy or waive any requirement in the application. Any changes must be in writing and signed by an authorized officer.

**Policy Date.** The date this policy was issued and the date on which the single premium payment is due. The Policy Date is also the date from which all policy years and anniversaries are computed.

**Annuity Date.** The Annuity Date is the date that the first income payment is payable. The Annuity Date is indicated on the Payment Schedule as the First Installment Due Date.

**Misstatement of Age or Sex.** If the age or sex of the Measuring Life has been misstated, any amount payable will be the amount which the premium paid would have purchased at the correct age or sex. After correction of the age or sex, any underpayment by the Company shall be paid to the Payee. The amount of any overpayments made by the Company will be charged against benefits falling due after adjustment.

**Incontestability.** This policy is incontestable.

**Payment Schedule.** The Payment Schedule is shown on page 3 of this policy. It shows:

1. The name of the Measuring Life;

2. The date of the first income payment;

3. The frequency of income payments;

4. The amount of each income payment; and

5. Guarantees of amounts to be paid.

**Measuring Life.** The Measuring Life is the person or persons upon whose date(s) of birth income payments are based. The Measuring Life is shown on the Payment Schedule.

**Payee.** The Payee is the person(s) designated in the Application to receive income payments.

**Income Payments.** Income payments will be paid to the Payee starting on the Annuity Date. The amount of income payments and the Annuity Date are shown on the Payment Schedule.

No Payee or Beneficiary of this policy shall have the power to commute or anticipate income payments. To the maximum extent permitted by law, payments will not be subject to:

1. Transfer (any attempt to make such transfer is void); or

2. Assignment (any attempt to make such assignment is void); or

3. Alteration (except for misstatement of age or sex); or

4. Claims by creditors before any payment is due; or

5. Encumbrance by creditors or Beneficiary; or

6. Judicial or legal process by creditors.

01015

4

**Proof of Survival.** Before making any payment under this policy, we may ask for confirmation that the Measuring Life, Payee or Beneficiary is still living. If proof is requested, no payment will be made or considered due until we receive this confirmation.

**Death of the Measuring Life (Other than a Joint Measuring Life).** If the Measuring Life dies after the minimum number of guaranteed income payments have been paid, payments will cease with the last installment due prior to the Measuring Life's death. No partial installment prorated to the date of death will be payable.

If the Measuring Life dies before the minimum number of guaranteed income payments have been paid, we will continue making payments at least as rapidly as they were being made before death until the minimum number of guaranteed payments have been paid. Such payments will be made to the Beneficiary. Income payments to a Beneficiary will begin after we receive due proof of the Measuring Life's death.

To the extent permitted by law, proceeds will not be subject to any claims of a Beneficiary's creditors.

**Death of a Joint Measuring Life.** If this policy has been issued with Joint and Survivor Measuring Lives, the Payment Schedule will show income payments to be made while both Measuring Lives are living, and thereafter. The first income payment after the death of one Measuring Life will be payable on the first payment due date after the deceased Measuring Life's death. Upon the death of the last surviving Measuring Life, income payments will cease unless a minimum number of payments have been guaranteed and such minimum number of payments have not been paid. No partial installment prorated to the date of death will be payable. Any income payments due after the date of death of both Measuring Lives will be made to the Beneficiary. The income payments will be based on the amount payable after the death of the first Measuring Life, as stated in the Payment Schedule.

## OWNER, BENEFICIARY, AND ASSIGNMENT PROVISIONS

**Owner.** The Owner is as stated in the application unless later changed and endorsed on this policy. Subject to any endorsement to the contrary, the Owner will have the right to receive every benefit and exercise every right the policy confers or the Company allows.

**Beneficiary.** The Beneficiary, as named in the application or later changed by the Owner, will receive, subject to the terms of this policy, any payments which are due after the death of the Measuring Life. Unless otherwise provided in the Beneficiary designation:

1. If any Beneficiary dies before the Measuring Life, that Beneficiary's interest will pass to any other Beneficiaries according to their respective interests;

2. If payments are being made to the last surviving Beneficiary, and such Beneficiary dies before all guaranteed payments have been made, such payments will be paid:

   A. As stated in the application or later changed by endorsement; otherwise

   B. To the estate of such Beneficiary.

**Change of Owner and Beneficiary.** The Owner or Beneficiary may be changed by the Owner unless the previous designation provides otherwise. The change may be made by submitting a written request to the Company's Home Office.

The change will take effect when we have endorsed this policy. However, after the policy is endorsed, the change will be deemed effective as of the date of the written request for change. However, we are not responsible for any payment or other action taken before we have received and acknowledged in writing your change request.

01015

5

**Common Disaster.** If we cannot determine whether a Beneficiary or the Measuring Life died first in a common disaster, we will assume that the Beneficiary died first. Proceeds will be payable on this basis unless otherwise provided by endorsement.

**Non-assignability.** No Payee or Beneficiary of this policy has the power to assign any payments or benefits of this annuity policy. Any attempt to make an assignment is void.

01015

6

AMERICAN
GENERAL
FINANCIAL GROUP

Structured Settlement
Annuity Application

American General Life Insurance Company, Houston, TX
Instructions: Please type or print in black ink.

| 1. MEASURING LIFE | Name: Last *Kent* | First *Kimberly* | | Middle *Ann* | |
|---|---|---|---|---|---|
| | Address: Street *220 N. Flynn Lane* | City *Phoenix* | | State *AZ* | Zip *85013* |
| | Sex *F* | Date of Birth ~~9855~~ | Social Security Number ~~9855~~ | | Daytime Telephone *(602) 266-7628* |
| 2. BENEFICIARY | *Estate of Kimberly Kent* | | | | |
| | Primary Beneficiary | SSN | Relationship Secondary Beneficiary | SSN | Relationship |
| 3. PAYEE (IF OTHER THAN MEASURING LIFE) | Name: Last | First | | Middle | |
| | Address: Street | City | | State | Zip |
| | Sex | Date of Birth | Social Security Number | | Daytime Telephone ( ) |
| 4. JOINT MEASURING LIFE, IF ANY | Name: Last | First | | Middle | |
| | Address: Street | City | | State | Zip |
| | Sex | Date of Birth | Social Security Number | | Daytime Telephone |
| 5. OWNER OF ANNUITY | Name: American General Annuity Service Corporation | | | Tax ID 76-0446159 | |
| | Address: Street 205 East 10th Ave | City Amarillo | | State TX | Zip 79101 |
| | The Owner is: ☐ Owner ☐ Partnership ☒ Corporation ☐ Trustee | | | | |

**PLAN APPLIED FOR AND SCHEDULE OF PAYMENTS:**

Guaranteed Lump Sum $25,000.00 on 5-1-2009.
Guaranteed Lump Sum $25,000.00 on 5-1-2011.
Guaranteed Lump Sum $25,000.00 on 5-01-2013.
Guaranteed Lump Sum $25,000.00 on 5-01-2015.
Guaranteed Lump Sum $25,000.00 on 5-01-2017.
Guaranteed Lump Sum $ 81,686.54 on 5-01-2019.

Amount paid with this application: $1.00     Valuable Consideration     ☐ Check if additional sheet attached.

Will the annuity applied for replace or be in exchange for any existing life insurance or annuity in this or any other Company? ☐ Yes ☒ No
If yes, give company, amount, year issued and reason _____

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement, commits insurance fraud, which is a crime and may subject the person to criminal and civil penalties.

I have read the above statements or they have been read to me. I represent the above statements are true and complete to the best of my knowledge and belief. I agree that this application shall be part of the annuity policy(ies) issued by the American General Life Insurance Company. Application is made with the knowledge and consent of the proposed measuring life(ves). I agree that any annuity policy issued upon this application shall be a policy of the state in which the Owner resides at the time of application.

Signed at **AMARILLO**, **TEXAS** on *6-8-2004*
City     State     Date

American General Annuity Service Corporation     by X *Breezy Steare*
Owner     Signature of Owner

FOR AGENT USE ONLY: I represent that the information given on this application is true and complete to the best of my knowledge and belief. To the best of your knowledge, is this insurance being purchased to replace or change any existing insurance or annuity? ☐ Yes ☒ No

*Ringler Associates*
Agent or Company Name

Signature of Agent *Manuel R. Valdez*     *760-471-7051*
Agent or Company No.     Telephone No.

American General Financial Group is the marketing name and service mark owned and used by American General Corporation and its subsidiaries, including American General Life Insurance Company.

AELC0373-2001

# AMERICAN GENERAL LIFE INSURANCE COMPANY

This is a **Single Premium Immediate** Annuity Contract. The guaranteed payments, if any, are stated on the Payment Schedule page of the Policy.

**READ THIS CONTRACT CAREFULLY.** This Policy explains how the annuity works, and is a legal contract between the Owner and the Company. All payments and benefits will be payable subject to the terms of this Policy. Examine the Payment Schedule page and attached Application. If any errors or omissions are found, immediately contact the Company.

### THIS POLICY IS NON-PARTICIPATING – DIVIDENDS ARE NOT PAYABLE.

### PLEASE READ THIS POLICY CAREFULLY.
### THE POLICY IS IRREVOCABLE AND HAS NO CASH VALUE OR SURRENDER VALUE AND CANNOT BE COMMUTED OR SURRENDERED.

### THIS POLICY IS A LEGAL CONTRACT BETWEEN THE OWNER AND AMERICAN GENERAL LIFE INSURANCE COMPANY.

For information, service or to make a complaint, contact your servicing agent or the Company's Administrative Office at:

American General Life Insurance Company

205 East 10th Avenue, Amarillo, TX 79101

01015

## AMERICAN GENERAL
FINANCIAL GROUP

# AGC LIFE INSURANCE COMPANY
# CORPORATE GUARANTEE

CLAIMANT: KIMBERLY ANN KENT

QUALIFIED ASSIGNMENT NO: 415710     DATE OF QUALIFIED ASSIGNMENT: 6-08-2004

AGC Life Insurance Company ("AGC Life"), a Missouri-domiciled life insurance company and an intermediate holding corporation and owner of certain of American General Corporation's major life insurance companies, as authorized by a resolution of AGC Life's Board of Directors, meeting on April 11, 2001, hereby states and represents as follows:

American General Annuity Service Corporation "AGASC"), a Texas corporation, is empowered to act as assignee with respect to qualified assignments of structured settlements, as provided in Section 130(c) of the Internal Revenue Code of 1986, as amended.

AGASC has entered into the above-referenced Qualified Assignment for the Claimant.

AGC Life represents that should AGASC fail to make any payments assumed in said Qualified Assignment as they become due, then AGC Life guarantees to make such payment or payments to Claimant promptly upon receipt of Claimant's written notice forwarded to the address indicated below. Said guarantee shall remain in force and effect so long as AGASC is obligated to perform under the terms of the Qualified Assignment.

AGC Life represents and warrants that it has all necessary authority to execute this guarantee and that this guarantee constitutes a legal, valid and binding obligation of AGC Life Insurance Company.

This statement is issued and dated this ___8TH___ day of ___JUNE___ , 2004 .

**AGC LIFE INSURANCE COMPANY**
Attn: General Counsel
2929 Allen Parkway
Houston, Texas 77019

By: _____
Rodney O. Martin, Jr.
Chairman and Chief Executive Officer

By: _____
Elizabeth Tuck
Secretary

**EXHIBIT B**

# MetLife®

Metropolitan Life Insurance Company
200 Park Avenue, New York, NY 10166

**Metropolitan Life Insurance Company (herein called MetLife) certifies that it will make the payments described in this certificate.**

| | |
|---|---|
| **Group Annuity Contract No.** | |
| | 8281 |
| **Certificate No.** | |
| | 88855 |
| **Measuring Life** | |
| | Kimberly Kent |
| **Date of Birth of Measuring Life** | |
| | December 31, 1960 |
| **Owner** | |
| | METLIFE TOWER RESOURCES GROUP, INC. |
| **Annuity Commencement Date** | |
| | February 1, 2016 |
| **Beneficiary (if any)** | |
| | Primary: Estate Of Kimberly Kent <br> Contingent: Not Applicable |

Form G.4324A

 COPY

**Rights of Owner:** The Owner owns the annuity described in this certificate. The Owner will have the right at any time to designate the payee, including the Beneficiary, to whom benefits are payable under the annuity. However, unless the Owner otherwise directs, MetLife will make all payments under the annuity to the person(s) named in the certificate.

In addition, at any time after the death of the Measuring Life, the Owner may direct MetLife to pay, in lieu of any term certain annuity payments described in this certificate, the commuted value of all remaining term certain annuity payments in a single sum to a payee named by the Owner. The commuted value of such annuity payments will be calculated using the same interest rate(s) as that used in determining the purchase price of the annuity.

No such change in payee or terms of payment will be effective until written notice of the change is received by MetLife. However, any change in a Beneficiary designation will take effect as of the date the request was signed but without prejudice to MetLife on account of any payment made by it before receipt of the request. When contacting MetLife the Owner should mention the Contract number and the name and certificate number of the Measuring Life.

**Proof of Living:** MetLife may require proof that the Measuring Life, the Beneficiary or other payee, as the case may be, is living on the date on which any annuity payment is to be made. If proof is requested, no payment will be made until the proof has been received by MetLife.

**Beneficiary:** If two or more Beneficiaries are designated and their respective interests are not specified, their interests will be several and equal.

**Change or Waiver:** No sales representative or other person, except an authorized officer of MetLife, may make or change any certificate or make any binding promises about any certificate on behalf of MetLife. Any amendment, modification or waiver of any provision of this certificate will be in writing and may be made effective on behalf of MetLife only by an authorized officer of MetLife.

**Misstatements:** If the age or sex of the Measuring Life or any other relevant fact has been misstated, MetLife will not pay a greater amount of annuity than that provided by the actual amount received to purchase the annuity and the correct information. Any overpayment of annuity will, together with interest, be deducted from future annuity payments. Any underpayment of an annuity will, together with interest, be paid immediately upon receipt of the corrected information. The interest rate(s) will be that used in determining the purchase price of the annuity.

**Nonassignability; Claims of Creditors:** This certificate and the payments provided under it are nonassignable and will be exempt from the claims of creditors to the maximum extent permitted by law.

Form G.4324A                                              (2)

Case 2:07-bk-03238-MCW    Doc 326-1    Filed 03/31/08    Entered 03/31/08 15:19:40
Desc  Main Document    Page 30 of 33

**Payment of Annuity:** MetLife will make payments under this certificate as follows:

On and after February 1, 2016 and up to and including January 1, 2026 if the Measuring Life is living, MetLife will pay monthly annuity payments to the payee named by the Owner. If the Measuring Life dies before January 1, 2026, and unless the Owner directs otherwise, MetLife will pay to the Beneficiary, up to and including January 1, 2026, the monthly annuity payments that are payable after the death of the Measuring Life. The rate of the monthly annuity payments is shown in item (1) below.

(1) . Monthly Rate of Annuity: $5,107.00.

Form G.4324A                                    (3)

# MetLife®

Metropolitan Life Insurance Company
200 Park Avenue, New York, NY 10166

## ENDORSEMENT

Notwithstanding any provisions to the contrary, this certificate is hereby endorsed as of its issue date as follows:

This certificate is not assignable. It cannot be transferred, assigned or pledged as collateral for a loan. Payments under this certificate cannot be changed or accelerated and paid before the payment due date.

No annuity payments payable under this certificate are payable in a single-sum, except as provided below:

If MetLife is presented with a court order which is a "qualified order" within the meaning of Section 5891 of the Internal Revenue Code of 1986, as subsequently amended, (the "Code") which orders the commutation of all or a portion of the remaining guaranteed payments to be paid under a structured settlement for which this certificate has been issued as a funding asset, MetLife will pay to a payee named by the owner a commuted payment.

MetLife will calculate the amount of the commuted payment using 95 percent of its annuity purchase rates in effect on the date of the court order, for the same or similar certificates. Only the remaining guaranteed payments will be commuted.

If such annuity rates are not available, the commuted payment will equal the present value of such guaranteed payments, and calculated using the following interest rate: the annual effective yield based on the current 30-year LIBOR swap rate plus 120 basis points (Source: Federal Reserve Statistical Release H.15) at the close of business on the date of the court order. If this date is not a business day, we will use the interest rates reported on the next following business day.

Any remaining portions of such guaranteed payments that are not commuted will be made on their specified due dates.

All requests for a commutation payment will be subject to MetLife's approval which will not be unreasonably withheld.

Metropolitan Life Insurance Company

*Gwenn L. Carr*

Gwenn L. Carr
Senior Vice President and Secretary

Form G.20247-571B

# Addendum No. 1
## Description of Periodic Payments

<u>Payable to "Kimberly Kent"</u>

Commencing 02/01/2016: $5,107 per month for 10 years only

Beneficiary:  Estate of Kimberly Kent. This beneficiary cannot be changed

Kimberly A. Kent, Esq. hereby waives and disclaims any and all ownership interest or liens that she may have in the settlement proceeds by reason of any applicable state statute, common law decision or ruling. By their signature, Jeffrey Turner and Kathryn Turner, for Morgan Turner, a minor, and Kim A. Kent, Esq. acknowledge that the attorney fee benefit payments are being made at the direction of the Claimant and for the convenience of the Claimant.

**Initials**

Claimant: _CGT_

Assignor: _DHB_

Assignee: _RM_

Claimant: _CGT_